**Thomas P. Riley, SBN 194706**
**LAW OFFICES OF THOMAS P. RILEY, P.C.**
**First Library Square**
**1114 Fremont Avenue**
**South Pasadena, CA 91030-3227**

**Tel: 626-799-9797**
**Fax: 626-799-9795**
**TPRLAW@att.net**

**Attorneys for Plaintiff**
**Garden City Boxing Club, Inc.**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Garden City Boxing Club, Inc.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**Miguel Juarez Zavala, et al.**<br><br>**Defendant.** | **CASE NO. CV 07-5925 MMC**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR DEFAULT JUDGMENT BY THE COURT** |

## INTRODUCTION

Plaintiff, Garden City Boxing Club, Inc. (hereinafter "Plaintiff") is an international distributor of sports and entertainment programming. By contract, Plaintiff purchased the domestic commercial exhibition rights to broadcast the *Erik Morales v. Marco Antonio Barrera III World Super Featherweight Championship Fight Program* of November 27, 2004. This *Program* included the main event (between Erik Morales and Marco Antonio Barrera) along with an undercard (preliminary) bouts, televised replay, and color commentary, hereinafter collectively referred to as the "*Program*".

Plaintiff thereafter entered into sublicensing agreements with commercial entities throughout United States and its territories, wherein it granted limited public exhibition rights to these entities (sublicensees) for the benefit and entertainment of the patrons within their respective establishments (i.e., hotels, racetracks, casinos, taverns, bars, restaurants, social clubs, etc.).

The interstate transmission of the Plaintiff's *Program* was encrypted and made available only to Plaintiff's customers (commercial locations which paid Plaintiff the requisite closed-circuit (commercial) license fees to exhibit the *Program*).

On November 27, 2004 an investigator observed the unlawful exhibition of Plaintiff's *Program* at the Defendant's commercial establishment. The investigator's observations were later documented in a sworn affidavit now before this Honorable Court. (See Declaration of Affiant.)

On November 26, 2007, Plaintiff filed suit against Miguel Juarez Zavala, individually and d/b/a TIJUANA MIKE'S MEXICAN RESTAURANT & TEQUILA BAR (hereinafter "Defendant") after Plaintiff's efforts to resolve this matter informally failed. The thrust of Plaintiff's Complaint alleged that the Defendant, and or his employees and or agents unlawfully intercepted and intentionally exhibited the *Program* at the Defendant's establishment for the purpose of direct or indirect commercial advantage, thereby violating Section 605 of the Federal Communications Act of 1934, as amended, as well as Title 47 U.S.C. § 553. Plaintiff's complaint also includes a pendant common-law claim of Conversion.

Neither the Defendant nor anyone acting on the Defendant's behalf filed an Answer or any other responsive pleading to Plaintiff's duly served complaint. Accordingly, on June 26, 2008, following Plaintiff's Request, the Court entered default against the Defendant in this action.

**WHEREFORE**, Plaintiff respectfully requests this Honorable Court now enter judgment against the Defendant as prayed forth below.

## DISCUSSION

### PLAINTIFF IS ENTITLED TO ENHANCED STATUTORY DAMAGES IN THIS ACTION

Once a default judgment is entered, "it generally is treated as a conclusive and final adjudication of the issues necessary to justify the relief awarded and is given the same effect as between the parties as a judgment rendered after a trial on the merits." ***Wright, Miller & Kane, Federal Practice and Procedures***, §2684, p. 4-19-20. The Defendant's default serves as an admission of Plaintiff's well-pled allegations of fact. ***Danning v. Lavine***, 572 F.2d 1386, 1388 (9th Cir. 1978). Accordingly, the only issue remaining to be decided in this case is the amount of damages, attorneys' fees, and costs to which Plaintiff is entitled from the Defendant for the unauthorized exhibition of Plaintiff's *Program*.

Title 47 U.S.C. Section 605 protects companies such as the Plaintiff against the theft of its proprietary communications such as the instant *Program.* See, ***International Cablevision, Inc. v. Sykes***, 75 F.3d.123 (2d Circ. 1996), ***Cimenelli v. Cablevision***, 583 F. Supp. 158, 161 (E.D.N.Y. 1984); ***Cablevision Systems v. Seimon***, 767 F.2d 1364 (1985); ***Quincy Cablesystems, Inc. v. Sully's Bar, Inc.***, 640 F. Supp. 1159 (D.Mass. 1986); ***National Subscription Television v. S & HTV***, 644 F.2d 820 (9th Cir. 1981); ***National Football League v. Alley, Inc***., 624 F. Supp. 6 (S.D. Fla. 1983). The majority of the Courts have found that Section 605 applies to cases where the end-user offender obtained a proprietary broadcast by way of a satellite (rather than cable) television programming system.

Title 47 U.S.C. § 553 was designed to provide a remedial scheme for unauthorized reception of cable communication. ***Home Box Office v. Gee-Cee, Inc***., 838 F.Supp. 436 (E.D. Mo. 1993). Certain courts have also held a private party plaintiff may recover civil damages pursuant to this statute where end-users violators unlawfully obtained a proprietary broadcast via satellite.

As a starting point, a party aggrieved under the Statutes may, at their discretion, recover either actual or statutory damages. **§§ 553(c)(3)(A) and 605(e)(3)(C).** Statutory damages may be awarded up to $10,000.00 for each violation. **§§ 553(c)(3)(A)(ii) and 605(e)(3)(C)(i)(II).** Additionally, if the Court determines the violations were committed "willfully and for purposes of direct or indirect commercial advantage or private financial gain," **the Court may award enhanced damages of up to $100,000.00 for each violation under §605(e)(3)(C)(ii) and $50,000.00 under §553(c)(3)(B)(III).** Because Plaintiff constitutes an aggrieved party under these telecommunications statutes (hereinafter " Statutes") (see §§553 (C)(1) and 605(D)(6)), Plaintiff is entitled to damages from the Defendant.

TIJUANA MIKE'S MEXICAN RESTAURANT & TEQUILA BAR is a commercial establishment, and could only lawfully obtain the *Program* if Plaintiff had contracted with Defendant for the rights to show the *Program*. However, this lawful approach was not taken. Therefore, Defendant must have undertaken specific wrongful actions to intercept an/or receive and broadcast the encrypted telecast. (See Plaintiff's Affidavit in Support of Plaintiff's Application for Default Judgment by the Court concurrently filed with this Memorandum (hereinafter "Plaintiff's Affidavit")). Since the Defendant must have committed wrongful acts in order to intercept, receive, and broadcast the *Program*, Plaintiff seeks substantial statutory damages from the court in this action.

Statutory damages are appropriate where actual damages are difficult to prove. ***Lauretex Textile Corp. v. Allton Knitting Mills, Inc***., 519 F. Supp. 730, 732 (S.D.N.Y. 1981). The lack of adequate proof of any particular element causes the Court to rely, within its discretion, on the statutory limitations. ***F.W. Woolworth Co. v. Contemporary Arts, Inc***., 344 U.S. 228, 233 (1952). In

the instant case, as more fully discussed infra, it would be impossible to calculate the full extent of the profits lost by Plaintiff and the additional damages sustained by Plaintiff as a result of the Defendant's unlawful actions. Accordingly, it is appropriate for Plaintiff to elect to receive statutory damages in the instant action.

In order to deter the unlawful use of communications such as the *Program*, Congress specifically designed the Statues to provide "both Prosecutor[s] and civil plaintiffs [with] the legal tools they need to bring piracy under control." ***Trademark & Satellite Acts, P.L****.-6678,* ***1988 U.S. Cong. & Admin. News*** **7**, 5577, 5658; See also ***U.S. v. Scott***, 783 F. Supp. 280, 281 (N.D. Miss. 1992). To reach these ends, the Statues include severe penalties, both civil and criminal, for those who intercept, receive and/or broadcast protected communications. See ***Scott***, 783 F. Supp. At 281; See generally §§ 553(b) and 605(e). Moreover Congress has equated a violation of the Statutes to theft of service. See **1988 U.S. Code Cong. & Admin. News 7**, 5577, 4642-43. In 1988, in an effort to further deter theft, Congress amended the Statues to provide for more severe penalties for violations. ***Id.*** at 5657.

As set forth within Plaintiff's Affidavit, the Defendant's interception, receipt, and broadcast of the encrypted *Program* was not inadvertent. Both §§ 553(c)(3)(C) and 605(e)(3)(C)(iii) provides for limited damages to the aggrieved party "[i]n any case where the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section . . . .", as stated by Congress, this type of situation occurs rarely:

> [i]t is not intended that this provision serve in any way as a defense to determination of liability under subsection (a), but rather only as provision to be exercised in the court's discretion for those rare instances of ignorance of the law on the part of one adjudged to have violated it.

***Cable Communications Policy Act***, P.L. 98-549, 5 U.S. Cong. News. '84 Bd. Vol. 8, 4745, 4751.

///

///

Instead, when Congress enacted the Statutes, it was specifically cognizant of the severe impact of theft of various wire communications, including closed-circuit programming, such as the *Program*.

As stated in the House Bill:

> "The Committee is extremely concerned with a problem which is increasingly plaguing the cable industry-the theft cable service. This problem has taken on many forms from the manufacture and sale of equipment intended to permit reception of cable services without paying for it, to apartment building dwellers "tapping" into cable system wire into building's hallway that issued for providing service to a neighbor's apartment unit, to the sale by building superintendents of cable converters left behind by previous tenants to new tenants. Such practices does not only often permit one to obtain cable services without paying the installation and hookup costs, but also, for instances, involve individuals gaining access to premium movie and sports channels without paying for the receipt of those services.
>
> Theft of services deprives the cable industry of millions of dollars of revenue each year which it should otherwise be receiving. The Committee believes that theft of cable service poses a major threat to the economic viability of cable operators and cable programmers, and creates unfair burdens on cable subscribers who are forced to subsidize the benefits that other individuals are getting by receiving cable service without paying for it".

***Cable Communications Policy Act of 1984, House Report No. 98-934, 5 U.S. Cong. News***. '84 Bd. Vol. -6, 4655, 4720. Moreover, according to Congress, these incidents threaten to undermine the satellite industry and adversely impact legitimate satellite dealers and satellite programmers who otherwise should be receiving payment for their programming or descrambling devices. See ***U.S. v. Scott***, 783 F.Supp. 280, 281 (N.D. Miss. 1992) (quoting 1984 U.S. Code Cong. & Admin. News 4655, 4746).

Therefore, in light of the above observations, as it first basis for relief, Plaintiff requests statutory damages pursuant to §§ 553(c)(3)(A)(ii) and 605(e)(3)(C)(i)(II). See ***Cable/Home Communication Corp. v. Network Production, Inc.***, 902 F.2d 829, 850 (11th Cir. 1990). Where both statutes have been violated, some Ninth Circuit courts have chosen to award damages pursuant only to § 605(e)(3)(C)(i)(II). *See* ***Kingvision Pay-Per-View, Ltd. v. Ortega***, 2002 U.S. Dist. LEXIS 24305, *6 (N.D. Cal. 2002). However, it is not unheard of for courts in this circuit to award damages pursuant to both statutes. See, ***Spencer Promotions Inc. v. 5th Quarter Enterprises Inc.***, 1996 U.S.

Dist. LEXIS 8686 (N.D. Cal. 1996).

Under Title 47 U.S.C. Section 605(e)(3)(c)(II), the amount of statutory damages to which Plaintiff is entitled for each violation shall be not less than $1,000.00 and no more than $10,000.00.

To determine appropriate statutory awards, Ninth Circuit courts have considered many factors, and these factors often overlap with the factors for enhancing damages. See generally ***Universal Sports Network, Inc. v. Jimenez****,* 2002 U.S. Dist. LEXIS 17709 (N.D. Cal. 2002) (considering intent to realize personal gain, repeat offenses, and the extent of the rebroadcast); ***Kingvision Pay-Per-View, Ltd. v. Rivers***, 2000 U.S. Dist. LEXIS 4338 (N.D. Cal. 2000) (considering repeat offenses, and awarding the statutory minimum only where one defendant was already out of business). Some courts will award the minimum amount automatically if the defendant profited less than $1,000.00 from pirating the fight. See ***Entertainment by J&J, Inc. v. Montecinos***, 2002 U.S. Dist. LEXIS 13633 (N.D. Cal. 2002). However, this reasoning should only be used if the Plaintiff seeks restitution damages or substitutional relief by invoking Section 605(e)(3)(C)(I) for actual damages. Other courts will award anywhere from $2,000.00 to $10,000.00 as a starting point. See ***Joe Hand Promotions, Inc. v. Dailey***, 2003 U.S. Dist. LEXIS 4091 (N.D. Cal. 2003); ***Spencer Promotions Inc. v. 5th Quarter Enterprises Inc.***, 1996 U.S. Dist. LEXIS 8686 (N.D. Cal. 1996).

Yet it is respectfully submitted that *the most* important factor in assessing damages is the deterrent effect of that the award. See generally ***Trademark & Satellite Acts*, P.L.-**6678, 1988 *U.S. Cong. & Admin. News* 7, 5577, 5658. Many courts factor deterrence into their damage enhancement for Section 605(e)(3)(C)(ii), although it may be more appropriate for the statutory damage calculation pursuant to Section 605(e)(3)(C)(II). See ***Joe Hand Promotions, Inc. v. Pete***, 1999 U.S. Dist. LEXIS 12651 (N.D. Cal. 1999) (awarding $5,000.00 to deter future transgressions); ***Entertainment by J&J, Inc. v. Montecinos***, 2002 U.S. Dist. LEXIS 13633 (N.D. Cal. 2002) (awarding $5,000.00 to deter future transgressions).

We would like to draw the Court's attention to one case where the enhanced statutory damages awarded, based solely on the deterrent effect, were more than three times what the transgressor would have paid to properly commercially license the event. See ***Entertainment By J&J, Inc. v. Al-Waha Enterprises, Inc***., 219 F. Supp. 2d 769, 777 (S.D. Tex. 2002). As noted by the Court, requiring the Defendant "to pay the price it would have been charged to obtain legal

authorization to display the Event does nothing to accomplish this objective of the statute." ***Id.*** Accordingly, it is respectfully submitted an award of the *enhanced* statutory damage *minimum* ($10,000.00) is a necessary baseline amount this Court should consider adopting to effectively deter parties such as the Defendant from stealing proprietary programming. Next, Plaintiff respectfully and additionally requests enhanced damages pursuant to Sections 553(c)(3)(B) and 605(e)(3)(C)(ii). Section 605(e)(3)(C)(ii) advises awarding up to $100,000.00 where "the violation was committed willfully and for the purposes of direct or indirect commercial advantage or private financial gain . . ." In similar circumstances, Section 553(c)(3)(B) will award an aggrieved Plaintiff up to $50,000.00. "Willfulness has been defined by the Supreme Court as 'disregard for the governing statute and an indifference for its requirements.'" ***Cablevision Sys. N.Y. City Corp. v. Lokshin***, 980 F. Supp. 107, 114 (E.D.N.Y. 1997) (quoting ***Trans World Airlines, Inc. v. Thurston***, 469 U.S. 111, 126 (1985)).

To determine intent for commercial or private gain, 9th Circuit courts often look for evidence of a cover charge, increased price of food/drinks, advertisements, or the number of patrons in attendance. See ***Entertainment By J&J, Inc. v. Perez***, 2000 U.S. Dist. LEXIS 17709 (N.D. Cal. 2002); ***Kingvision Pay-Per-View, Ltd. v. Arias***, 2000 U.S. Dist. LEXIS 162 (N.D. Cal. 2000). However such requirements are largely illogical and inconsistent with the very nature of the infringing activity. Commercial signal pirates are looking to avoid, not attract, detection for their unlawful acts, and have no financial investment in the programming they are unlawfully exhibiting.

Mindful of this, Courts today are now looking at the act interception and not promotion of the event itself in calculating appropriate damages. For instance in ***Al-Waha***, the plaintiff *did not* provide evidence of a cover charge or advertisements of the subject fight. 219 F. Supp. 2d at 776. Nevertheless, the Court rightfully awarded enhanced damages to the aggrieved party plaintiff. ***Id***. at 777. "Based on the limited methods of intercepting closed-circuit broadcasting of pay-per-view events and the low probability that a commercial establishment could intercept such a broadcast merely by chance, however, courts have held conduct such as that of [the Defendant] . . . to be willful and for the purposes of direct or indirect commercial advantage or private financial gain." ***Id.*** at 776 (citing ***Kingvision Pay-Per-View, Ltd. v. Admiral's Anchor, Inc.*** No. 2, 172 F. Supp. 2d 810, 812 (S.D.W.Va. 2001); ***Time Warner Cable v. Googies Luncheonette, Inc***., 77 F. Supp. 2d 485, 490; ***Time Warner Cable v. Taco Rapido Restaurant***, 988 F. Supp. 107, 111. Enhanced statutory damages should likewise be awarded in the instant action now before this Honorable Court.

## CONCLUSION

The unauthorized interception, receipt and broadcast of the *Program* and other closed-circuit programming threatens the economic viability of the promotions industry. There are no countervailing social or policy considerations that justify the unauthorized interception of these broadcasts. See ***ON/TV* of *Chicago v. Julien***, 763 F.2d 839, 843 (7th Cir. 1985); ***Subscription Television of Greater Washington v. Kaufman***, 606 F. Supp. 1540, 1544 (D.D.C. 1985).

As a result of theft by the Defendant and others, Plaintiff has lost and will continue to lose its legitimate commercial customers which are unwilling and financially unable to compete with those unauthorized locations, such as TIJUANA MIKE'S MEXICAN RESTAURANT & TEQUILA BAR, which exhibit sports and other closed-circuit programming in an unlicensed manner. Because these unauthorized commercial establishments offer programming to their patrons for no fee (or for a fee which is less than the authorized establishments charge), the legitimate commercial establishments cannot attract paying customers to offset their sizeable investments in commercial licensing and event promotion, and as a result, and incur substantial financial loss. Therefore eliminating the prospect that they will continue purchasing commercial exhibition licenses from the Plaintiff in the future.

Theft of closed-circuit broadcasts, such as the *Program*, by unauthorized commercial establishments, such as TIJUANA MIKE'S MEXICAN RESTAURANT & TEQUILA BAR, adversely impacts both Plaintiff and its lawful customers. Plaintiff pays substantial fees to the promoters of the events to obtain the exhibition rights to sublicense the broadcast of closed-circuit programming to authorized commercial establishments. Plaintiff's *exclusive* source of revenue is the sublicense fees which it charges to authorized commercial establishments for the right to broadcast closed-circuit boxing and entertainment programming such as the *Program*. The corrosive effect of commercial signal permanently destroys of Plaintiff's lawful customer base. See ***Cox Cable Cleveland Area, Inc. v. King***, 582 F. Supp. 379, 381 (E.D. Ohio 1983).

Further, as a direct and proximate result of piracy, Plaintiff suffers severe damage to its goodwill and professional reputation, and has invariably lost its right and ability to control and receive fees for transmission of the *Program*. See ***Quincy Cablesystems, Inc.,*** *640 F.Supp*. at 1161. When negotiating sublicense fees, Plaintiff represents to commercial establishments that it exercises supervision over the commercial distribution of its programming. When an unauthorized commercial

establishment intercept, receive, and broadcast closed-circuit programming, such as the *Program*, Plaintiff's reputation and goodwill suffers irreparable damage with its existing and prospective commercial customers from what appears to be a misrepresentation of such capabilities on its own part. Ultimately, piracy simply devaluates the product being lawfully developed, marketed, licensed, or sold to the detriment and injury of all.

Clearly, Plaintiff should receive just and substantial compensation from the Defendant for these losses suffered. Modest awards of statutory damages cannot meet that test. Damages calculated focused on the ill-gotten gains derived by the pirate as opposed to the injury inflicted will never meet that test.

Rather, the sustenance of Plaintiff's small family business concern depends upon the willingness of commercial establishments to pay the Plaintiff sublicense fees for its programming, and the Courts' willingness to deal fairly but ever most firmly with the rising tide of theft of Plaintiff's intellectual property.

While it maybe unconventional to award the Plaintiff the quantum of damages it now prays for from a defendant in a default setting, piracy is nothing less than outright theft and a firm judicial hand is required to stop this predatory behavior and compensate the aggrieved accordingly.

Respectfully submitted,

Dated: July 15, 2008

*/s/ Thomas P. Riley*

**LAW OFFICES OF THOMAS P. RILEY, P.C.**
By: Thomas P. Riley
Attorneys for Plaintiff
Garden City Boxing Club, Inc.

**PROOF OF SERVICE (SERVICE BY MAIL)**

I declare that:

I am employed in the County of Los Angeles, California. I am over the age of eighteen years and not a party to the within cause; my business address is First Library Square, 1114 Fremont Avenue, South Pasadena, California 91030. I am readily familiar with this law firm's practice for collection and processing of correspondence/documents for mail in the ordinary course of business.

On July 15, 2008, I served:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR DEFAULT JUDGMENT BY THE COURT**

Miguel Juarez Zavala (Defendant)
2316 Cooley Avenue
East Palo Alto, CA 94303

I declare under the penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct and that this declaration was executed on July 15, 2008, at South Pasadena, California.

Dated: July 15, 2008

*/s/ Emily Stewart*
**EMILY STEWART**